### HENRY E. KOESTER v. TOLEDO & OHIO CENTRAL RAILWAY CO.

**1. RULE AS TO SUBMITTING QUESTIONS TO JURY.**

In cases where the testimony is such that the minds of reasonable men might differ as to whether a party has been guilty of negligence or not, the question should be submitted to the jury and it is improper for the court to interfere.

**2. RULE AS TO LOOKING AND LISTENING AT CROSSINGS.**

Unless circumstances are such as to excuse a person of ordinary care and prudence from looking and listening, it is negligence as a matter of law to approach and cross a known railroad crossing without looking and listening for approaching trains.

**3. NEGLIGENCE—NOTWITHSTANDING SUCH TESTIMONY.**

Although a party may testify that he looked and listened, upon approaching a known railroad crossing, if the circumstances were such that by looking and listening, in the exercise of ordinary care, he must have seen an approaching train, such party will be held guilty, as a matter of law, of contributory negligence, notwithstanding his testimony that he looked and listened.

**4. RULES APPLIED.**

Where it appeared that plaintiff approached, about dusk, but while there was sufficient light to enable him to see, a railroad crossing, well known to him, and at a point where at a distance of 185 feet from the crossing, a person could see down the track, in the direction from which the train came, a distance of 820 feet, and 65 feet from the crossing could see down the track nearly half a mile, and that plaintiff, driving in a top buggy, with side curtains down, and at an ordinary gate, was struck and injured by a freight train which approached at ordinary speed, at the crossing, the court held that if he had looked he must have seen the train or if he had listened he must have heard it, and that if he did look and listen, he must be deemed to have been so careless and negligent as to constitute contributory negligence which will defeat his recovery ; and that the trial court properly directed a verdict for the defendant.

*James & Beverstock*, counsel for plaintiff.

*James O. Troup*, counsel for defendant.

HEARD ON ERROR.

HULL, J. (orally.)

This action comes into this court upon a petition in error, to reverse the judgment of the court of common pleas.

The action was brought by the plaintiff against the railroad company to recover damages for injuries which he claims he received on account of the negligence of the railroad company. The court, at the

conclusion of the plaintiff's testimony, upon motion of the defendant, directed a verdict for the defendant, to which the plaintiff excepted, and thereafter judgment was entered upon the verdict in favor of the defendant.

The plaintiff claims in his petition that in the afternoon of January 22, 1899, between five and six o'clock, he was driving in his buggy along Main street in the village of Woodside in this county, and that he was struck by a freight train running over the defendant's track, as he crossed the tracks at Main street in said village, and he claims the negligence of the defendant was that no signal was given by the trainmen, either by whistling or ringing the bell as required by the statute; that his buggy was injured and he suffered personal injuries for which he asks damages.

The answer of the defendant is substantially a general denial; and alleges, by way of defense, that the plaintiff was guilty of contributory negligence, and that whatever injury he suffered, if any, was caused by his own carelessness and negligence.

But one question is made in the case, and that is, that the court erred in directing a verdict for the defendant at the close of the plaintiff's testimony; so that the question here is rather a question of fact, to be decided, however, in the light of the law as it has been laid down by the courts and especially by the Supreme Court of our own state.

The claim of the defendant is that the plaintiff was guilty of negligence, in that he did not look and listen as he approached the railroad crossing, as he was required to do by the law of the land. The general rule of law governing such cases is well known and thoroughly established by the courts, not only in this state but perhaps all the states, and that is: That when one who is in the full possession of his faculties is approaching a railroad crossing, he is bound to look and listen for approaching trains unless the circumstances are such as would excuse a person of ordinary care and prudence from so looking; and unless there are such circumstances as would excuse a person of ordinary care and prudence from looking and listening, it is negligence as a matter of law to approach and cross a known railroad crossing without both looking and listening for approaching trains.

The consideration of this case involves an examination to some extent of the testimony, a brief examination of it so far as is necessary to determine whether the court erred in directing a verdict for the defendant.

There is another rule of law, and that is, if the testimony is such that the minds of reasonable men might differ as to whether a party had been guilty of negligence or not, then it is improper for the court to interfere, but the question should be submitted to the jury; and so where it is a question that reasonable minds might differ upon as to whether an ordinarily prudent man would be excused from looking and listening, that question should be submitted to the jury and should not be determined by the court.

If there are no circumstances which would excuse a person of ordinary care and prudence from looking and listening, then, if it appears that he did not look and listen, if it was practicable to do so, his negligence becomes a matter of law under the authorities of this state.

The plaintiff, according to his own testimony, had been out some distance from the village of Woodside on this Sunday, and along towards evening, when it was growing perhaps a little dusk, reached the village

of Woodside. There is an allegation in the petition which might be material; that the headlight on the engine was not of sufficient strength to show a light as far ahead as it should have been shown, but nothing seems to have been made of it on the trial of the case nor here. That there was a headlight on the engine does not seem to be disputed, and it was light enough at this time to see a train of cars without a light, for a number of witnesses were called who were about there and no one testified that it had grown so dark but what a train of cars could be seen readily.

Plaintiff had been out in the afternoon looking after his oil wells and was returning home. He was thoroughly familiar with this crossing, as his own testimony shows. He had crossed it for a year prior to the accident every day or every alternate day and was perfectly aware of the fact that he was approaching a railroad crossing. There is an allegation in the petition that there was no warning sign at this crossing, but nothing seems to have been made of that, and that would not be material in any event as plaintiff was fully aware of the fact that he was approaching this crossing.

It was about five o'clock; he came from the west and was driving east and the train which struck him came from the north. He was driving along the main street of the village of Woodside upon which there were some houses, and some photographs were introduced in evidence to show that the houses were not built closely together but were some distance apart. There was also a store on this street, about two hundred and fifty feet from the railroad crossing, and plaintiff was asked this question: "State whether you stopped along that street anywhere," and he answered that he did, about two hundred and fifty feet from the crossing. He says he stopped for the purpose of fixing a tug on his harness, that had become unfastened. Somewhere in the record, it is shown that he stopped about in front of the store. After he had repaired his harness he got into the buggy and drove across the track. He was asked to state what he did at the time he got out of the buggy, and he says: "I listened, but I did not hear any train; I could not see anything on account of them houses; I looked so far as I could see."

That is to say he could not see where he was at that time two hundred and fifty feet from the track, on account of these houses. He could not see the train if he was looking, with a house between him and the railroad track. The photographs show that there was a considerable space between the houses. The undisputed testimony discloses that for a distance of one hundred and eighty five feet there were no houses; between the last house and the railroad crossing it was one hundred and eighty-five feet; there was in this space a stave shed, about eighteen feet wide and a hundred and thirty feet long and it had at that time, at the end toward the crossing, about a carload of staves that obscured the view for a very short distance; that is the staves did; the stave shed was entirely open from the ground to the roof, leaving a space to see the cars through. At the time he got into the buggy, he says: "I listened, but I did not hear any train." That is, he listened at a point two hundred and fifty feet from the crossing and he could not see anything on account of the houses: He says: "I looked as far as I could see."

Q. Did you hear anything? A. No.

Q. You may state what if anything happened after that? A. Why, I drove on towards the track and as my horse came close to the

track of course I seen the engine, and my horse commenced jumping and I could not hold him and he went up and down and my buggy got struck by the engine.

Q. How long a time, was it from the time your horse got scared until you were injured? A. I don't know. Not any time at all.

Q. And you may state as to where you were after the injury?

And he said he was picked up about thirty feet from the track, and sustained personal injuries to some extent but recovered sufficiently to be out after a time.

Now it will be observed by this testimony of the plaintiff, in the examination in chief, he is asked: " State what you did at the time you got out of the buggy and at any time up to the time you crossed the railroad track?" and he says " I listened, but I could not hear any train, but I could not see anything on account of them houses. I looked so far as I could see."

So it would appear from his answer that he did not look after he had got beyond the houses, for he says he could not see anything on account of the houses. On his cross-examination he testifies that he was familiar with this crossing and that he had crossed it every day or so, and on page seven of the record he is asked :

Q. You stopped and got out of the buggy to fix this tug about two hundred and fifty feet west of the crossing? A. Just about.

Q. And when you were two hundred and fifty feet west of the crossing, the houses down on these lots were in your way so you could not see? A. I can not say that.

Q. And you looked as far as you could through those houses and then you got in your buggy and drove on, supposing there was nothing coming? A. My horse, as I got in the buggy—my horse went on a trot about four or five miles an hour and as I passed on I looked.

Q. You trotted up to the crossing on a slow trot? A. Yes four or five miles an hour. As I got about—well, past the store, looked out the buggy and I did not see no train. It was getting dusk and it was cloudy and as I drove on towards the track you know, I don't know how many feet I was, there came the train, and then my horse commenced jumping and getting scared with the steam and I could not hold him.

He says his horse was not a spirited horse.

Q. Where you stopped was in front of the store? A. A little bit further back to the west.

Q. Then when you got in your buggy your horse started without your telling him to start and you went on a trot of four or five miles an hour right along? A. Yes, I started the horse up again when I got in the buggy.

He was riding in a top buggy with curtains on the sides, and, as appears from his testimony, after he got in the buggy his horse started on a trot, at the rate of four or five miles an hour. This testimony is susceptible of an interpretation and construction that he did not look after he got beyond the last house. One or two of his answers however would indicate that he might have done so, but his testimony on that point is somewhat indefinite; but it would be fair to conclude that he meant to have it understood that after he got out from behind the houses he looked and did not see the train.

There is another principle of law which has been laid down by our Supreme Court, and that is, that although a party testifies that he looked and listened, if the circumstances are such that by looking and listening

in the exercise of ordinary care he must have seen an approaching train, he will be held guilty, as a matter of law, notwithstanding his testimony that he looked and listened.

It does not avail a man to testify that he looked and listened for an approaching train when it is clear that if he had looked and listened and exercised ordinary care, he must have seen the train or heard it approaching, and if the undisputed facts show that if a party had looked and listened with ordinary care he must have become aware of the approaching train, it will be held that if he did look and listen, he did it so negligently that he himself was guilty of contributory negligence which contributed to his own injury and therefore cannot recover.

A witness by the name of Marks, an engineer of the railroad company was put upon the stand by the plaintiff to testify to a plat offered in evidence, and he testified that he made the plat and the accompanying measurements correctly, and on cross-examination was asked some questions in regard to the distances that one might see up the track to the north, while approaching it on Main street, as the plaintiff was at the time of the accident, and these distances are indicated on the plat by figures and red lines. It is best to read from his testimony, so as to get it exactly as the witness testifies :

Q. You took all the measurements? A. Yes, sir.

Q. Do these figures on the dotted red lines indicate the distances of the point of view from the crossing? A. Yes, sir.

This further point of view west of the crossing is 185 feet is it? Q. A. Yes, sir.

Q. And the next one, as you approach, is 160 feet? A. Yes, sir.

Q. And the next one is fifty-two feet? A. Yes, sir.

Q. And the next one is thirty-six feet? A. Yes, sir.

Q. And the next one is twenty-five feet ? A. Yes, sir.

Q Now the red line which is drawn from the point 185 feet west of the crossing northward passes in front of all buildings, does it not? A. Yes, sir.

Q. It is west of the stave shed and stock pens? A. Yes, sir.

Q. But it passes between all of the houses and the railroad track, does it not? A. Yes, sir.

Q. Take the next point of view which is sixty-five feet west of the crossing, and you can see down the track from that point north, how far? A. You can see to a point two thousand feet.

So that at one hundred and eighty-five feet from the crossing the plat shows you can see down the track eight hundred and twenty feet. At sixty-five feet from the crossing, according to the undisputed testimony in the case (this testimony was not contradicted or disputed by anyone), you can see down the track nearly a half mile. There were no houses between that point and the railroad track, except this stave shed, and there only a carload of staves at one end which obstructed the view for ten or twelve feet. There was a fence, but it was not of such a height as to obstruct the view of one sitting in a buggy.

These questions then were asked:

Q. You can see down the track then 2,000 feet? A. Yes, sir.

Q. And that line passes in front of all the houses, does it not? A. Yes, sir.

Q. So that there is absolutely nothing to obstruct the view along that line? A. Nothing.

Q. Neither is there anything to obstruct the view on the first line, commencing 185 feet from the crossing? A. No, sir.

Then this question was asked:

Q. Now we will come down to the point fifty-two feet from the crossing. Is it not true that you can see from that point two miles down the railroad track? A. It is true with the exception of the staves that are now piled there.

Q. I am not asking you about now. From that point you can see down the track two miles? A. Yes, sir.

Q. With absolutely nothing to obstruct the view? A. Nothing.

Q. It clears the stave shed on the west? A. Yes, sir.

Q. And about the stock pens—where the line crosses the stock pens is an ordinary fence? A. Yes, sir.

Q. About the same height of the fence along the right of way? A. Yes, sir

Q. So that you can look over the top of it if you were merely standing there? A. Yes, sir.

Q. And from a buggy you could see clear over? A. Yes, sir.

Q. Now coming to the point of view thirty-six feet west of the crossing, is it not true that you could see 282 feet down the railroad track without any obstruction? A. Yes, sir.

Q. That line passes east of the stock pens and east of the stave shed? A. Yes, sir.

Q. So that there is absolutely nothing in the way for 282 feet down the railroad track? A. Yes, sir.

Q. And when you get on the side track, which is still twenty-five feet away from the crossing, you can see without any obstruction clear down two miles north? A. The side track is not twenty-five feet away, but when you get twenty-five feet away from the center of the crossing of the main track you can see down the track two miles. It is not immediately on the side track, but to the west of the side track.

Q. Just west of the side track you can see two miles? A. Yes.

Q. And you can see free of all buildings, sheds and everything? A. Yes, sir.

Q. Now state if it is not true that a man walking along here on foot can see the smoke stack of the engine if he were looking and the engine were coming, over the top of that shed? A. Yes, I believe he could.

Q. And riding in a buggy, is there any doubt about his being able to see the smoke stack of the engine over the top of that shed? A. No sir, not to my mind.

On page 12 this question is asked him: "I thought you did not understand me. So that it is true from the point 185 feet west of the crossing up to the crossing, there is only a space of about ten feet where a man could not see an engine coming down the track if he were looking?" and he answered " I think that is the fact of the case."

This then, was the uncontradicted testimony as to the conditions surrounding that crossing and the ability to see a train as it approached from the north as he approached the crossing from the west, as the plaintiff did. So that it appears from this testimony that for the full distance of one hundred and eighty-five feet there was an unobstructed view of this track for the distance of 820 feet a distance far enough to enable one to see the train and stop with safety. Now it was not dark at this time. The freight train was running at an ordinary rate

of speed; it is not claimed that it was going faster than freight trains usually do; probably going twelve or fifteen miles an hour. It was making the noise that trains of that character usually make. It was heard by many people, some of whom were called as witnesses by the plaintiff. There were some witnesses who lived and were in the vicinity of this crossing, called to testify in regard to the signals. They testify that they did not hear the signals given. Several testify that the signals were not given. The plaintiff testified he neither saw nor heard the train. These nine witnesses to whom I have referred all heard the train. Some of them saw it. Some of them were in the houses around and about, and heard this train. Another was in his house lying on a lounge and heard the train as it went by. His wife and daughter also heard it. So that all the people near that crossing who were called by the plaintiff, nine in number, heard this train as it approached the crossing and testified they did not hear any signal given. The plaintiff, according to his own testimony was going along in a top buggy with the curtains down. He was not in a position to hear an approaching train, perhaps, with himself surrounded by the top of the buggy and curtains. He was trotting along at a four or five mil· gait. So far as the evidence shows, he did not slacken the speed of his horse until his buggy was finally struck by the train. Can it be held that the plaintff might have looked and listened with ordinary care for this approaching train and not see or hear it? He had this full one hundred an ı eighty-five feet to look for the approach of this train. At sixty-five feet from the crossing he could see down the track two thousand feet, and at a hundred and eighty-five feet he could see eight hundred and twenty feet. Twenty-five feet from the crossing he could see two miles and with this unobstructed view he testified that he did not see the train, and although all these persons who were called by him as witnesses testified they heard the train, he testified that he did not hear it.

It seems to us that from this testimony, under the authorities in this stat , this plaintiff, as a matter of law, must be held to have been guilty of contributory negligence; that if he had looked he must have seen the train, or if he had listened, with ordinary care, he must have heard it. He had abundant opportunity to see i· and hear it, and therefore if he did look and listen, and did not see it or hear it, he must have looked and listened in a manner so negligent as to be guilty of contribu ory negligence. If he did not look and listen, then he was clearly guilty, under· the law, of contributory negligence, and can not recover.

The cases in which this doctrine is laid down are so familiar and well known to the profession that it is hardly worth while to cite them. In connection with this testimony two or three cases may be referred to, however, which are in point. One is Cleveland, Columbus & Cincinnati Railroad Co. v. Crawford, Admr., 24 Ohio St., 631, the first paragraph of the syllabus of which reads as follows:

"Ordinary prudence requires that a person in the full enjoyment of the faculties of hearing and seeing, before attempting to pass over a known railroad crossing, should use them for the purpose of discovering and avoiding danger from an approaching train, and the omission to do so, without a reasonable excuse therefor, is negligence, and will defeat an action by such person for an injury to which such negligence contributed."

It might be excused if the circumstances were such that it would be reasonably excusable not to look and listen; the Supreme Court say

that might excuse his failure to look and listen, but in this case there is absolutely nothing to excuse the plaintiff from looking and listening. He knew he was approaching a railroad crossing; he was perfectly familiar with it and thought of it, and at the time he had an unobstructed view for 185 feet from the crossing. There appears to be absolutely nothing to excuse him from complying with the rule laid down by this case and the other authorities in this state.

In C., C. & I. R. R.Co. v.Elliott, 28 Ohio St., 340, the second paragraph of the syllabus reads: "The omission to ring the bell or sound the whistle at public crossings is not of itself sufficient ground to authorize a recovery, if the party, notwithstanding such omission, might by the exercise of ordinary care have avoided the accident." ·

And the last paragraph of the syllabus reads: "It is the duty of a traveller upon the highway, when approaching a railroad crossing, to make use of his senses to ascertain if there is a train in the vicinity; and if, when in full possession of his faculties, he fails to see or hear anything, when a prudent man, exercising his eyes and ears, with ordinary care, would have discovered a train in close proximity, and he is thereby injured, he is guilty of such negligence as will prevent a recovery."

The language of that paragraph of the syllabus will be noticed: "If, when in full possession of his faculties, he fails to see or hear anything, when a prudent man, exercising his eyes and ears, with ordinary care, would have discovered a train in close proximity, and he is thereby injured, he is guilty of negligence." Although he says he did look and listen. In Pennsylvania Co. v. Rathgeb, 32 Ohio St., 66, this rule is laid down again, and the Supreme Court say, on page 72 of the opinion: "We think the law must now be considered as well settled, that the traveler approaching a crossing must be upon the lookout for danger. Ordinary care requires that he must look and listen to see if a train is in the vicinity, and if he fails in this, it is not merely evidence of negligence to be considered by the jury, it is itself such negligence as will prevent a recovery."

And on page 73 in the opinion, the court say: "Being able to see, herefore, and the opportunity of seeing being presented, his failure to .iscover or to be aware of the approaching cars, we think, was not only evidence of negligence, but negligence itself, and sufficient to justify a verdict against him." ·

To hold that the plaintiff in this case was entitled to have this question submitted to the jury under the undisputed facts, it seems to us would be to hold directly contrary to the law as laid down by the Supreme Court in this state.

The court, in our judgment, under this testimony, was required by the law in this state to do what was done—direct a verdict for the defendant.

The evidence was clear and undisputed that the plaintiff might have seen this train in time to avoid injury. The fact that he testified he looked from time to time as he does testify in rather an indefinite way, is not sufficient under the law of this state to require a submission of the question to the jury. The evidence is uncontroverted and clear that he had abundant opportunity to see and hear this train. If he had

looked with proper care he must have seen it, or, if he had listened he must have heard it, and the conclusion as a matter of law is, that he either did not look or listen and therefore cannot recover, or, if he did look and listen, he was so careless and negligent that he must be deemed guilty of contributory negligence as a matter of law.

For these reasons the judgment of the court of common pleas will be affirmed.

---

## WILLS.

[Warren Circuit Court, April Term, 1900.]

Smith, Swing and Cox, JJ.

### ELIZA WALKER V. DAVID WALKER ET AL.

1. DEVISE OF FEE WITH DEVISE OVER—CONSTRUCTION.

The doctrine that, where real estate is devised in terms denoting an intention that the primary devisee shall take a fee simple on the death of the testator, followed by a devise over in case of his death without issue, the latter words refer to a death in the lifetime of the testator, is not the law of this state; under the decisions of the Supreme Court such words, or words of similar import, are to be interpreted according to their popular and natural meaning, and as referring to the time of the death of the first taker, unless the contrary intention is plainly expressed in the will, or is necessary to carry out its undoubted purpose.

2. DEVISE IN FEE—PAYMENTS IMPOSED—RULE AS TO UNDEFINED ESTATES.

A will by one provision giving testator's children land in fee simple, and by other provisions imposing upon devisees the burden of making large payments of money to his executors, to be used in the payment of legacies to other children, and for the payment of the debts of the testator, will not be considered as indicating an intention of the testator to give a fee simple title to the land devised subject only to the charges imposed. This rule only applies to cases where the devise is so indefinite that the intention of the testator can not easily be ascertained, and not where the estate is by appropriate language devised in fee simple, with the further provision that if he shall die without issue, or leaving no issue, that it shall pass to other persons.

3. WORD "HEIRS" CONSTRUED TO MEAN "CHILDREN."

Where in a will the word "children" is used in all the devises and bequests, and it is then provided that if any of them "die without issue or leave no surviving issue" then that such bequest to him shall "pass to my other surviving heirs," the word "heirs" must be construed to mean "children" also, and therefore, on the death of one of the children without issue, the land devised to him goes to the children then living, exclusive of the issue of children who have died before.

HEARD ON ERROR.

SMITH, J.

This case involves the construction of the will of Samuel B. Walker, late of Warren county O., deceased, executed February 4, 1843, and admitted to probate shortly after his death, which took place December 6, 1845. The question to be considered is, what estate was given to Thomas D. Walker, one of the sons of the testator, in the lands devised to him under item 5 of the will by the terms thereof and other provisions made by the testator in his will, and who are the present owners thereof. So far as it is necessary to state the provisions of the will, they are as follows: